## Richmond.

### N. & W. Railroad Co. v. Shippers Compress Co.

April 28th, 1887.

1. CARRIERS—*Contract—Breach—Liability—Ultra vires—Waiver.*—V. & T. Air Line agreed to load steamers chartered by S. C. Co. with cotton to be delivered by a certain day, but failed to deliver the cotton till some days later, when it was loaded.   Under its charter-party, the S. C. Co. had to pay a certain sum per. day for demurrage ; whereof the V. & T. Air Line was aware—

HELD :

　　1. The contract was not *ultra vires* on the part of the V. & T. Air Line.

　　2. It was liable to the S. C. Co. for the amount paid by latter for demurrage.

　　3. Its liability was not waived by S. C. Co.'s accepting delivery after the agreed day.

2. PRACTICE AT COMMON LAW—*Judgment.*—Where only one of several defendants has been served with process, judgment may be rendered against him.   Code 1873, ch. 167, ₴ 50.

Error to judgment of corporation court of city of Norfolk, rendered April 29, 1886, in an action of trespass on the case, wherein the Shippers Compress Company was plaintiff, and the Norfolk and Western Railroad Company and several other bodies corporate doing business together as an association under the name of the Virginia and Tennessee Air Line were defendants.   The verdict and judgment were against the N. & W. R. R. Co. alone for $1,555.39 damages, and that company obtained from one of the judges of this court a writ of error and *supersedeas.*

*Sharpe & Hughes* and *Wm. J Robertson,* for the plaintiff in error.

*Starke & Martin,* for the defendant in error.

Fauntleroy, J., delivered the opinion of the court.

The plaintiff is a corporation under the laws of Virginia, with power to charter steamers and other vessels, and to load them with cotton. Under this power it chartered two steamers, the Liscard and the Linhope, to come to Norfolk and load with cotton for transportation to Liverpool, England. The charter party provided that the plaintiff should pay demurrage for every day's detention of the said steamers beyond the days specified for their sailing respectively. "The Shippers Compress Company," of Norfolk, Virginia, having so chartered these said steamers in September, 1881, advertised to the shippers or owners of cotton, both local or interior, in printed circulars, headed, "Room and Offers for Liverpool Cotton." In making offers for shipping room upon these steamers to any one in particular, this blank form thus headed would be filled in with specifications of the number of bales of cotton, the rate of through freight to Liverpool from the port of Norfolk, the day upon which the steamer must sail, and the last day allowed for the cotton proposed to be shipped to be in Norfolk and aboard the steamer in time for her to sail at the time appointed.

The Virginia & Tennessee Air Line, embracing the Norfolk & Western Railroad Company, with its connections stretching far to the west and southwest, with local agents at important points in the cotton country, had their agent at Norfolk, W. T. Payne, (appointed by Mr. Fink, the general manager of the Virginia, Tennessee & Georgia Air Line system,) who, in addition to his other duties, had special charge of and conducted the cotton business of the

system, as a specialty separate from the general freight business. In this capacity the Shippers Compress Company addressed to him sundry of these forms, filed in with specifications, as follows:

"(3) ROOM AND OFFERS FOR LIVERPOOL COTTON.

" W. T. PAYNE, ESQ.,
    "*Agent Virginia & Tennessee Air Line,*
                    "*Norfolk, Va.:*
    "*Dear Sir,*—We offer room on the steamship Liscard, Bri. nationality, A 1 class, for 300 bales of compressed cotton, at ocean rate 26d., no primage. (1) Ship will sail on October 6, 1881. (2) Cotton must be in Norfolk October 4, 1881. (3) This offer of room and rates expires ——, 18—.
                    "Respectfully,
                    "SHIPPERS COMPRESS COMPANY,
                            "BARTON MYERS, Pres.
"NORFOLK, VA., *September* 27, 1881."

Of these offers (of which the foregoing is an example of the others exhibited in the record), Payne, as such agent, formally accepted room for 2,450 bales of cotton for the Liscard, with stipulation that it should be delivered in Norfolk by the eighteenth of October, 1881; and for 2,870 bales for the Linhope, to be delivered in Norfolk, October 19, 1881; the said times for delivery having been so agreed, altered and adjusted by the contracts of acceptances aforesaid. A large amount of the said cotton so contracted to be delivered by Payne, agent, to-wit: 1,560 bales were delivered for the Liscard *after* the eighteenth of October, and 1,127 for the Linhope *after* the nineteenth of October, 1881. In consequence of this delay the steamers were detained at a cost in demurrage of $334 for the Liscard, and $889 for the Linhope, which amounts for demurrage

were paid by the Shippers Compress Company; and which, with interest from the time of payment, measure the actual loss sustained by the said compress company by reason of the failure of the said Virginia & Tennessee Air Line to deliver the cotton at the times agreed on.

Finding that the cotton was being delivered slowly, and fearing that it would not arrive in due time, Myers, president of the compress company, frequently saw Payne, agent, and urged him to get the cotton to Norfolk, telling him that the steamships would be on demurrage for detention after the days appointed for their sailing; and on the seventeenth of October, 1881, he addressed to Payne a letter stating that he would be required to indemnify the compress company from whatever loss might arise from the delay, and giving the demurrage per day on each vessel, which letter he sent to him by his clerk, and on that day Payne sent the following telegrams:

"Norfolk, Va., *October* 17, 1881.

"*To* J. R. Ogden,

"*G. F. A., Knoxville, Tenn.:*

"Parties have given us notice that we must pay one hundred and fifty dollars per day demurrage for steamers waiting for *our* cotton engaged to be here at our stated time.

"W. T. Payne, Agent."

"October 17, 1881.

"B. Hughes,

"*Agent, Memphis, Tenn.:*

"If Liscard is not in time, we have notice of one hundred and fifty dollars per day demurrage until it arrives. Parties cannot get cotton to take its place at this late day. We must stop the business, if we propose to do it in this way. Better hurry cotton along.

"W. T. Payne, Agent."

This last telegram alludes to the endeavor of the compress company to procure local cotton to take the place of that delayed, but which they could not do, if at all possible, except at a cost much greater than the demurrage; and, if the ships had sailed without the cotton, the loss, "dead freight," would have been $4,873.60, nearly three times a much as the demurrage.

After demand for indemnity for this demurrage which had been paid by the compress company for the detention of the steamers as aforesaid, and much negotiation to effect an equitable settlement of its claim, the said Air Line and its agent, Payne, failing to pay, this action was brought against all the associated companies and connections forming the Air Line, and, the whole matter of law and fact being referred to the court, a jury being waived, the court rendered judgment for the plaintiff against the appellant, which was the only one of the three railroad companies composing the Air Line on whom process had been served.

From this judgment the Norfolk & Western Railroad Company appeals, and assigns error: "(1) That it ignores the true nature of the cotton business," and that there was no contract between the compress company and Payne, as agent of the Air Line; and (2) that, if there was a contract, the compress company can recover no damages, as it received the delayed cotton after the times agreed on, and by so doing waived its claims for damages; and, besides these assignments of error in the petition for a writ of error, the counsel for appellant have urged, in their oral argument at bar, that the contract was *ultra vires* and void.

We have stated the facts of the case as presented by the record at length, and in their due order, because we think that the mere statement of these facts shows plainly that the judgment of the corporation court of Norfolk is correct, and must be affirmed. They show all the elements of a contract expressly entered into between the Shippers Com-

press Company, on the one hand, and the associated or connected railroad companies composing the Air Line, through Payne, their agent, on the other; the offer of the Shippers Compress Company to Payne, their agent, as their agent to carry so many bales of cotton by certain chartered vessels from Norfolk to Liverpool, at a certain rate,—the offer stipulating the *times*, as a most important and essential condition of the engagement, when the cotton must be in Norfolk; and the acceptance of Payne, as such agent, of the said offer, to the extent of 5,320 bales, unconditionally, and without qualification. There is no dispute as to the terms, or as to the offers and acceptances; and, if there were conflict in the evidence certified, that of the appellant conflicting would be disregarded by this court. The record shows that Payne, as agent of the railroad companies composing the Air Line, was expressly authorized to make, and had been in the constant habit of making, just such contracts for the carrying of cotton, even sometimes contracting for the whole capacity of ships for the purpose, and that he endeavored, as agent for the Air Line, to adjust and settle this claim. That he considered it a contract binding upon his principals is clearly shown by his repeated and urgent telegrams to his and the Air Line's *interior* agents at the time, in regard to the hurrying up and delivery of this cotton according to their engagement, and their responsibility for failure or delay.

The record shows, and it is not denied, that the appellant was a member of both the Virginia & Tennessee Air Line and its successor, the Virginia, Tennessee & Georgia Air Line. The offers made to Payne were distinctly addressed to him as "agent of the Virginia & Tennessee Air Line," made out on blank forms, gotten up and used by him in his business as such; and his acceptances were signed by him as such agent. All of the transactions of the compress company with him were as such agent, and he was ap-

pointed by Mr. Fink, the general manager of the Air Line, as their agent specially for this business,—the cotton business over this Air Line; and all persons dealt with him, and knew him, only as agent for the Air Line.

So far as the contracts sued on are concerned, the Shippers Compress Company had nothing to do with the interior shippers of cotton, did not know who they were, or anything about them, or where the cotton was to come from which Payne, as agent for the Air Line, contracted to deliver at a fixed time, and then telegraphed to his interior agents to procure and send on for delivery. The owners or shippers of the cotton had nothing to do with the contracts, and never at any time, or in any way, agreed to deliver any of this cotton to the compress company, and are in no way liable to that company for the breach of a contract which they did not make, or authorize Payne to make for them.

Payne was the agent of the associated companies composing the Air Line, appointed by them expressly for the special business of making the contracts sued on, and judgment was, under Code 1873, ch. 167, § 50, properly rendered against one defendant, the others not being served with process. The record shows that the appellee was careful, to an extraordinary degree, to lessen the damages which the appellant, by its breach of contract, had caused, and for which it was liable; while it had the right to permit the steamers to sail on the appointed days without the cotton, and hold the Air Line for $4,873.60 "dead freight," it yet, after endeavoring in vain to obtain local cotton to supply the derelict cotton, detained the steamships for a few days on demurrage, until the appellant could get the cotton and deliver it, and by so doing saved the appellant over $3,000. Allowing a party to complete his contract is no waiver of a right or claim to damages or loss incurred and actually paid, caused by his failure to complete it at the time agreed on. *Phillips & C. Const. Co.* v. *Seymour,*

91 U. S. 646, 651. Payne knew that his cotton was behind-hand, and that the steamers were on demurrage, waiting for it. He did not tell the Compress Company to send the ships off without it; but, on the contrary, telegraphed time and time again to his local interior agents, hurrying up the cotton, and telling them that he was notified that he must pay demurrage. On October 17, (three days before demurrage began,) Myers, president, wrote to Payne, agent, that he would have to pay demurrage, and giving to him the amount per day for each vessel; and Payne showed by his conduct that he deemed it best, as greatly it was, for his principals to detain the vessels until the cotton could arrive and be delivered, (as was done for a few days,) and thereby lessen the damage which appellant by his breach of contract had become liable to pay.

As to the argument urged by appellant's counsel that the contract made by Payne, agent for the delivery of this cotton, was *ultra vires*, we think the point is not well taken. The contract was incident to and for the benefit of their business as common carriers, and it was but a part of a long-established and systematic policy of these railroads composing the Air Lines to induce and control the transportation of cotton for the interior, west and southwest, over their line, for shipment to England from the port of Norfolk. It was not a contract to buy or sell cotton, but simply to deliver a certain number of bales of cotton, at a specified time, at Norfolk, for shipment to Liverpool by chartered steamers for that purpose. It was not contrary to or forbidden by their charter, and it was for the interests of commerce, and in the line of their business.

"There is no question but that railroad corporations have, as auxiliary or incident to their main or authorized business, all the powers which an individual would have under the same circumstances; and the extent of these powers is to be determined, not only by reference to the

express powers conferred by the charter, but also to the nature, extent, and necessities and conveniences of the business, and of the public." 1 Wood, Ry. Law, p. 474, § 170. "There is no question but that, under the head of its implied powers, a corporation, especially a railroad corporation, may, in order to increase its business, enter into many contracts and undertakings which are not strictly within its express powers, if they are not expressly prohibited, and are essential to promote the business of the corporations, or add materially to the convenience of its prosecution." Id. 479, 480. "It is hardly necessary to say that a railroad company has, by inference, power to enter into any and all species of contracts which are incident to the purposes for which it was created, and the business in which it is engaged, except in so far as this power is expressly or impliedly restricted by the terms of its charter, or the general law, the same as an individual might do, and is entitled to the same rights under, and is subject to the same liabilities upon, contracts as an individual would be." Id. p. 523, § 179; Pierce, R. R. 499–501. "May contract to haul certain quantity of freight per month." Wood, Ry. Law, p. 523, § 182. "May contract with connecting lines." Pierce, R. R. p. 508–510.

In the light of these authorities, and for the foregoing reasons, we are of opinion to affirm the judgment of the corporation court of Norfolk appealed from, with costs to appellee.

Judgment affirmed.