THE ST. JOSEPH & ST. LOUIS RAILROAD COMPANY, *Appellant*, v. THE ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY.

135  173
73a 428

135  173
96a  1243
96a  1246

135  173
177  ³ 34

Division Two, June 30, 1896.

1. **Landlord and Tenant:** SUBLESSEE: RENT. Revised Statutes, 1889, sections 6388 and 6389, do not give the landlord a right of action at law against a sublessee for rent unless a lien is sought or the right of attachment exists.

2. ————: LEASEHOLD: ASSIGNMENT: SUBLEASE. An assignment of a lease is a transfer of the lessee's whole interest in the leasehold premises while an underlease leaves a portion of the lessee's estate still in him; in the former case a privity in estate between the original lessor and the assignee is created, whether the instrument be in form an assignment or a lease, and the transferee becomes bound by the covenants of the original lease regardless of his intention in the matter.

3. ———: SUBLESSEE: RENT: RAILROAD.  A railway company, lessee of plaintiff company, made a contract with defendant whereby defendant agreed to take and operate the company's railroads, including the one leased from plaintiff, collect the revenue therefrom and apply the same to paying costs of repairs, insurance, taxes, interest on bonds and mortgages, and expense of maintaining organization, turning the surplus, if any, over to the company, and to keep account of receipts and expenses of the lines thus acquired, which should be open to inspection by the company's officers and servants.  *Held*, that the instrument was not a sublease of plaintiff's road, but an operating contract merely, which created no privity of estate or contract between plaintiff and defendant, and therefore plaintiff could not sustain an action for the rent against defendant on the covenants contained in the original lease.

4. Lease: UNDERTENANT: COVENANT TO KEEP IN REPAIR.  An undertenant who covenants to keep leased premises in repair is not liable for breach of a similar covenant made by the original lessee of the premises long before the undertenant took possession.

5. ———: COVENANT TO KEEP IN REPAIR.  A covenant to keep in repair imposes on the tenant an obligation merely to keep the premises in as good condition as they were when the agreement was made.

### ON MOTION FOR REHEARING.

1. Written Contract: LEASE.  The fact that the parties to a written instrument called it therein a lease is not conclusive where the instrument on its face shows it to be a different one.

2. ———: ———: RAILROAD OPERATING CONTRACT: ADMISSION.  In an action for rent founded on a written instrument, which on its face is a railroad operating contract and not a lease, an admission in the answer that it is a lease is not conclusive on defendant where such admission is accompanied by a profert of the instrument itself.

3. Railroad: POWER TO CONTRACT: STATUTE.  Under Revised Statutes, 1889, section 2588, authorizing railroad corporations to contract with each other in any manner not inconsistent with the scope, object, and purpose of their creation and management, one corporation which includes leased lines in its system may make a valid contract with another to take its entire system, and operate it for a series of years.

*Appeal from St. Louis City Circuit Court.*

AFFIRMED.

*Everett W. Pattison* for appellant.

(1) Respondent is liable for the rent and penalties, whether the lease of April 10, 1884, constituted an assignment or only a sublease. R. S. 1889, secs. 6388, 6389; *Martin v. Hicks*, 25 Mo. App. 359; *Hulett v. Stockwell*, 27 Mo. App. 328; *Garroute v. White*, 92 Mo. 237. (2) Respondent is liable for damages for nonrepair of appellant's property, whether the lease of April 10, 1883, constitutes an assignment or only à sublease, inasmuch as respondent covenanted with the Wabash to keep appellant's road in repair. *Bank v. Leyser*, 116 Mo. 51; *State ex rel. v. Gaslight Co.*, 102 Mo. 472; *Fontaine v. Lumber Co.*, 109 Mo. 55; *Rogers v. Gosnell*, 58 Mo. 589; *Meyer v. Lowell*, 44 Mo. 328; *Flanagan v. Hutchinson*, 47 Mo. 237; *State v. Railroad*, 125 Mo. 596; 1 Wood's Land. & Ten. [2 Ed.], pp. 270, 371, 797, 799, 807; 2 Platt, Leases, 190, 196; *Schieffelin v. Carpenter*, 15 Wend. 400; *Meyers v. Burns*, 35 N. Y. 269, 272; *Lockrow v. Horgan*, 58 N. Y. 635; *Green v. Eden*, 2 Th. and Cook (N. Y.) 582. (3) Independently of the statute, and of the rights accruing to appellant under the express covenants contained in the lease of April 10, 1883, respondent is liable for rent and repairs because that instrument constituted in law an assignment of appellant's lease. *First.* A demise of leased property for a term extending beyond the term of the original lease is necessarily an assignment of the original term. 1 Taylor L. & T., secs. 14, 15, 16; sec. 111; 2 *Id.*, sec. 426; Bouvier's Law Dict., Lease; Woodfall's L. & T. 258; 1 Wood's L. & T. [2 Ed.], pp. 146, 727; *Hicks v. Downing*, 1 Ld. Raym. 99; *Langford v. Selmes*, 3 Kay & Johns. 220; *Wollaston v. Hakewill*, 3 M. & G. *297; *Beardman v. Wilson*, 38 L. J. C. P. 91; *Porter v. French*, 9 Ir. L. Rep. 514; *Pluck v. Digges*, 5 Bligh, N. R. 31; *Stewart v. Railroad*, 102 N. Y. 601;

*Sexton v. Chicago Storage Co.*, 129 Ill. 318; *Smith v. Kelley*, 45 N. Y. S. R. 49; *Craig v. Summers*, 47 Minn. 189; *Railroad v. Settegast*, 79 Tex. 256; *Lee v. Payne*, 4 Mich. 106; *Blumenberg v. Myres*, 32 Cal. 93. *Second.* The question here is not to be confounded with one arising between the sublessor and the sublessee. This latter depends on the contract. In the case at bar, the rights of appellant grow out of privity of estate. *Stewart v. Railroad*, 102 N. Y. 601; *Sexton v. Chicago Storage Co.*, 129 Ill. 318; *Craig v. Summers*, 47 Minn. 189, 192; *Porter v. French*, 9 Ir. Law Rep. 514; *Adams v. Beach*, 1 Phila. 178. *Third.* The cases relied on by respondent, and cited by the referee in support of his conclusion, all fall within the class which involve the construction of the sublease as between the immediate parties to it, thus determining rights growing out of the contract. None of them determine the rights growing out of the privity of estate between the original landlord and the lessee of his lessee. *Fourth.* The question what intention is evidenced by the instrument of April 10, 1883, is immaterial. *Fifth.* The lease of April 10, 1883, conveyed to respondent the lessor's entire interest in appellant's lease. No reversion was left in the Wabash company. See cases already cited. The condition as to forfeiture in the lease does not constitute a limitation, but only a condition subsequent, and did not prevent the vesting of the entire interest in respondent for the entire term. 1 Tayl. L. & T., sec. 273, n. 4, 275, 279, 288; 2 *Id.*, sec. 492. *Studdard v. Wells*, 120 Mo. 25; *Ruddick v. Railroad*, 116 Mo. 25; *Ellis v. Kyger*, 90 Mo. 600; *Adams v. Lindell*, 5 Mo. App. 197; 72 Mo. 198; *O'Brien v. Wagner*, 94 Mo. 93; *Morrill v. Railroad*, 96 Mo. 174, 179; *Wills v. Gas Co.*, 130 Pa. 222; *Craig v. Summers*, 47 Minn. 189, 193; 4 Kent's Comm. 126; 2 Bouv. Inst. 273; 6 Am. and Eng. Ency. of Law, 903,

and cases cited.   *Sixth.*   The introduction of new or different covenants does not prevent such lease from operating as an assignment.   See cases cited under previous heads.  (4)  As assignee of the leasehold, respondent is liable upon all the covenants of the lease during the time its estate continued.   *First.*   It became liable upon the covenant to put and keep our road in good order and condition.   See cases cited under 2, *supra;* also, 1 Wood's L. & T. [2 Ed.], 792; *Huston v. Railroad*, 21 Ohio St. 235; *Harris v. Colbourn*, 3 Harr. 338; *Martyn v. Clue*, 18 Ad. & Ell. 661; *Conover v. Smith*, 17 N. J. Eq. 51; *Railroad v. Kenney*, 82 Ky. 154; *Railroad v. Reeves*, 64 Ga. 492; *Lydick v. Railroad*, 17 W. Va. 427.   *Second.*   It is liable for the rents.   See cases cited under foregoing heads.   *Third.* It is liable not only for the rents, but for the penalty provided in the lease in case of default.   1 Wood's L. & T., sec. 333; *Masury v. Southworth*, 9 Ohio St. 340; *Thinn v. Chomley*, Croke, Eliz. 383; *Brendloss v. Phillips, Id.* 895; *Clark v. Barlow*, 4 Johns. 183.   (5) The privity of estate, and hence respondent's liability, continued from April 10, 1883, the date of the lease to respondent, until April 24, 1886, the date on which appellant forfeited its lease.   *First.*   Respondent could rid itself of liability only by assigning over.   There was no assignment of the lease by respondent.   It did not even surrender the lease.   R. S. 1889, sec. 5183. *Smith v. Brinker*, 17 Mo. 148; *Public Schools v. Ins. Co.,* 5 Mo. App. 91; *Guinzburg v. Claude*, 28 Mo. App. 258; *Ebling v. Fuglein*, 2 Mo. App. 252; *Negley v. Morgan,* 46 Pa. St. 281; *Schieffelin v. Carpenter*, 15 Wend. 400; *Walton v. Cromley*, 14 Wend. 63; *Childs v. Clark*, 3 Barb. Ch. 52; *Sanders v. Partridge*, 108 Mass. 560; *Bonneti v. Treat*, 91 Cal. 223; *Chicago, etc., Co. v. Sewing Mach. Co.*, 25 N. E. 669; 1 Wood's L. & T.,

sec. 340. *Second.* The appointing of the receivers, and the taking possession by them with respondent's consent, did not terminate its privity of estate. *Railroad v. Humphreys,* 145 U. S. 82; *Railroad v. Humphreys,* 145 U. S. 105; *State ex rel. v. Ross,* 122 Mo. 435; also 118 Mo. 57.

*Wells H. Blodgett, A. G. Cochran,* and *H. S. Priest* for respondent.

(1) Appellant is not entitled to recover in this case, if the contract of April 10, 1883, between the Wabash company and the Iron Mountain company was a sublease, for three reasons: *First.* Because, at common law, an original landlord has no action against a subtenant for the recovery of rent, there being neither privity of contract, nor privity of estate between them. Taylor's Landlord and Tenant [5 Ed.], par. 448; 1 Woodfall on Landlord and Tenant, p. 265. *Second.* Because our statute (sec. 6388) has not changed the common law rule, except to the extent of giving a lien on crops, and the right of attachment in suits for recovery of the rent of agricultural lands. *Third.* Because, on the admitted facts in this case, there was a surrender of the lease of the Wabash to the Iron Mountain company on May 19, 1884. Taylor's Landlord and Tenant [5 Ed.], par. 514; McAdam on Landlord and Tenant [2 Ed.], sec. 207; *Buck v. Lewis,* 46 Mo. App. 227; *Stone v. Whiting,* 2 Starkie, 235; *Murray v. Share,* 2 Duer (N. Y.), 183; *Randall v. Rich,* 11 Mass. 493. (2) Under the pleadings in this case, appellant should not be heard to contend that the contract of April 10, 1883, between the Wabash and the Iron Mountain company was an assignment. In its petition it states that the instrument was a sublease, and in its answer, respondent admitted its execution

as a sublease.   Appellant can not declare on one cause
of action and recover on another and different one.
*Buffington v. Railroad*, 46 Mo. 246; *Waldheir v. Rail-
road*, 71 Mo. 514; *Haynes v. Trenton*, 108 Mo. 123;
*Larsons v. Street R'y Co.*, 110 Mo. 254.   (3) Appel-
lant states no fact in its petition which, if true, would
make the Iron Mountain company liable as an assignee
of appellant's lease to the Wabash.   The petition does
not state that the Iron Mountain company took the
entire term, or the entire estate, of the Wabash com-
pany in appellant's road, and without that there could
have been no assignment.   *Dunlap v. Bullard*, 131
Mass. 161; Taylor's Landlord and Tenant [5 Ed.],
par. 16; *Stewart v. Railroad*, 102 N. Y. 607.   (4) As
the statement of a cause of action by a landlord
against the assignee of a lease, the petition is so defect-
ive as to be subject to demurrer, or motion in arrest,
after judgment.   Chitty on Pleading [7 Am. Ed.], top
p. 401; Bliss on Code Pleading, secs. 221 and 228;
Stephen on Pleading, p. 299.   (5) The contract exe-
cuted April 10, 1883, between the Wabash and the
Iron Mountain company, did not operate as an assign-
ment because it did not vest in the Iron Mountain all
the estate the Wabash had, or the same estate the
Wabash had, in appellant's road.   *Proprietors v. Grant*,
3 Gray (Mass.), 147; *Dunlap v. Bullard*, 131 Mass.
163; *Pearce v. Kilrain*, 1 McM. Eq. 233; *Adams v.
Chaplin*, 1 Hill, Chy. 271.   (6) The general provisions
of the contract between the Wabash and the Iron
Mountain company, bring it clearly within the class of
instruments that have been universally treated by the
courts as under-leases.   *Post v. Kearney*, 2 N. Y. 394;
*Ganson v. Taft*, 71 N. Y. 48; *Collins v. Hosbrouck*, 56
N. Y. 157; *Dunlap v. Bullard*, 131 Mass. 161; *United
States v. Hickey*, 17 Wall, 9; *Callomer v. Kelly*, 12
Iowa, 319; *Church v. Grant*, 3 Gray (Mass.), 147.   (7)

Appellant can not recover against the Iron Mountain company, as an assignee of its lease to the Wabash, because after the execution of the Wabash mortgage of June 1, 1880, the entire legal estate of the Wabash, in appellant's road, could not be again assigned to the Iron Mountain company by any deed or instrument executed by the Wabash company alone. After the Wabash company had once conveyed the legal estate in its term to the trustees, it could not again assign that same estate to another. In Missouri the mortgagee holds the legal estate, and the mortgagor has only an equity of redemption. *Schanewerk v. Hoberecht*, 117 Mo. 22; *Kennedy v. Siemers*, 120 Mo. 73; *Springfield, etc., Co. v. Donovan*, 120 Mo. 423. (8) It is the assignment of the legal estate, and not of an equity of redemption, that renders a party liable on the covenants that run with the land. Woodfall on Landlord and Tenant, p. 257; Taylor's Landlord and Tenant [8 Ed.], par. 669; 2 Platt on Leases, p. 415. (9) When one takes a term as assignee, after it has been mortgaged, he is not liable on the covenants that run with the land. *Mayor, etc., v. Blamire*, 8 East, 487; *Wilkins v. Fry*, 1 Merivale, top p. 265; *Webb v. Russell*, 3 T. R., side p. 392. (10) A mortgagor not being able to make a good lease, after having executed a mortgage on the premises, certainly can not make a good assignment. That a mortgagor can not make a good lease without the concurrence of the mortgagee, see 1 Platt on Leases, page 173; Taylor's Landlord and Tenant, paragraphs 118, 119, and 120; 1 Jones on Mortgages, paragraphs 776, 777, etc.

GANTT, P. J.—Prior to June, 1874, the St. Joseph & St. Louis Railroad Company owned a line of railroad from North Lexington to the city of St. Joseph, a distance of about seventy-two miles, and on the first day

of June, 1874, it leased its said railroad for a term of ninety-nine years to the St. Louis, Kansas City & Northern Railway Company.

The St. Louis, Kansas City & Northern Railway Company was afterward, in 1879, consolidated with the Wabash Railway Company, of Illinois, Indiana, and Ohio, thereby forming a corporation known as "The Wabash, St. Louis & Pacific Railway Company," and in the further discussion of this case it will be designated the "Wabash company." By virtue of the consolidation the Wabash became the lessee of the St. Louis & St. Joseph Railroad.

By that lease, so far as it pertains to the issues of this case, the Wabash company agreed to pay rental for the first and second years, $10,000 per annum; for the third, fourth, and fifth years, $35,000 per annum, and for each subsequent year during the term, thirty per cent of the gross earnings of the demised railroad, the Wabash company guaranteeing that said percentage should not in any year amount to less than $25,000. The Wabash company furthermore covenanted and agreed that it would put the railroad culverts, bridges, station houses, and all other demised property in such order and repair, at its own cost and charges, as to enable the road to be safely and successfully operated, *at the earliest practicable day*, and operate the same, keeping it in such order and condition during the term of the lease.

It was also provided that in case of default in the payment of rent the Wabash company (but not its assigns) should pay as a penalty, in addition to the rent due, a sum equal to one tenth of one per cent on the amount due for each day during such period of default, until the lease became forfeited or the rent should be paid; and, finally, it was provided that said lease should not be assignable, or the premises under-

let, without the written consent of the St. Joseph & St. Louis Company, signed by its president and countersigned by its secretary, and authorized by a resolution of its board of directors, and that any attempt to sublet or assign said lease without such written consent, should work a forfeiture thereof.

*Second.* The evidence shows that when the foregoing lease was negotiated, the parties fixed upon the very low rental of $10,000 per annum for the first two years, because of the bad condition of the property, and because of a contention on the part of the Wabash company, to the effect that it would require the earnings of the road for the first few years to put it in good repair. The evidence shows that the Wabash company did not comply with its covenant to put the road in repair, and that it did not put it in such condition *at the earliest practicable day*, as would enable it to be safely and successfully operated.

*Third.* On the first day of June, 1880, the Wabash company, to secure an intended issue of bonds to the amount of $50,000,000 (of which $17,000,000 were issued), conveyed all its lines of railroad and the income and earnings thereof, including the road from North Lexington to St. Joseph, in trust to the Central Trust Company of New York, and James Cheney of Indiana.

*Fourth.* On the tenth day of April, 1883, the Wabash company executed an instrument, in the granting clause of which it let, demised, and leased, unto the Iron Mountain company, all and singular, the several lines of railroad then owned, leased, or otherwise held by it, including the line from North Lexington to St. Joseph, to have and to hold said property unto said Iron Mountain company for a term of ninety-nine years. That contract contained a covenant on the part of the Iron Mountain company to efficiently work and operate

said roads, and use reasonable diligence to collect and receive the tolls, freight charges, and dues which should accrue from the operation of said property, and apply said revenues in the manner following, to wit:

(1)  To the payment of the annual cost of repairing, maintaining, and perpetuating, for public use, the said railroads with their equipment and property; to the cost of any new equipment, side tracks, stations, depots, lands, and reasonable or necessary betterments from time to time deemed necessary; to premiums for insurance, and to the payment of all taxes and assessments lawfully levied upon said property.  (2)  To the payment of the necessary expenses of maintaining the organization of the Wabash, St. Louis & Pacific Railway Company, including the expenses of its general offices in the city of New York, the expenses of a transfer agency, and of paying the interest on its mortgaged debt.  (3)  To the payment of interest, as the same became due, upon the mortgage bonds of said company, and the rents and other charges which the Wabash company had contracted or assumed to pay as part of the consideration upon which its lines had been acquired, and other charges of like nature which the Wabash company might authorize or direct the Iron Mountain company to pay.  (4)  It was to pay any surplus remaining to the Wabash company, or apply the same to the payment of interest on any other bonds thereafter issued by the Wabash company, or to such other purposes as should be determined from time to time by the board of directors of the Wabash company.

The lease also contained the following provisions:

"If the net earnings or revenue shall not be sufficient to provide for the fixed charges on the demised property, the lessee may elect to advance the funds required from time to time to pay interest on bonds

and other fixed charges, and such advances· shall be a preferred debt and lien next to the lien of the first and general consolidated mortgages and underlying or divisional mortgages, to be paid by the party of the first part; and the same is secured by the future net revenues of said first party, and such advances are hereby made an equitable lien on the demised property.

"If the lessee, however, elects not to advance any such deficit, and the interest on the first and general consolidated mortgage bonds and underlying bonds shall remain unpaid for a period of six months, the lessor company may thereupon elect to terminate this lease, and to receive back the property on the payment of any balance of indebtedness then due from it to the lessee.

"The party of the second part moreover shall and will, at all times during the hereby demised term, keep the buildings upon the lands hereby demised insured in the usual manner against loss by fire, paying the premium therefor, as aforesaid; and will keep the said demised railroad, equipment, and property in good order and repair, and will at the expiration of the hereby demised term, *or other sooner determination of this lease and contract, yield and deliver up the hereby demised railroad and appurtenances in the same good order and repair that the same are now in,* or may be put in during the hereby demised term, casualties, acts of God and the elements, and reasonable wear and tear excepted."

*Fifth.* On the twenty-first day of December, 1883, the Wabash company mortgaged and conveyed to the Iron Mountain company all its lines of railroad, including the line from North Lexington to St. Joseph, to indemnify and secure said Iron Mountain company against any loss on account of the advancements it

had made or might make under the foregoing lease of April 10, 1883.

It was further provided in the contract that the Iron Mountain should keep accurate accounts of all the business, receipts, and revenues arising from the operation of the Wabash and all the expenses of operating the same; said accounts to be kept in such form and manner that the earnings of the Wabash might be readily ascertained and determined and that the Iron Mountain books relating thereto should be subject to the examination of the president and vice-president of the Wabash or any agent by them authorized to examine the same and the Iron Mountain bound itself to furnish the Wabash monthly accounts of the gross receipts and expenditures and a semi-annual account of all the business, receipts, revenues, and expenditures under this agreement. And the president, vice-president, and committees of the board of directors and all duly appointed agents of the Wabash should have the right at all times to travel without charge over the said road for the purpose of ascertaining as to the business and management of the said railroad and reporting thereon to the officers of the Wabash.

The Wabash had possession of plaintiff's railroad from 1879 until April 10, 1883, at which time the defendant, the Iron Mountain railroad, took charge of it under the foregoing contract of that date and continued to operate and control it until May 29, 1884, on which date receivers appointed by the United States circuit court took charge of it with the written consent of defendant.

On the twenty-fourth of April, 1886, the plaintiff declared its lease to the Wabash forfeited and resumed possession of its railroad by and with the consent of the federal court.

This action is by the St. Louis & St. Joseph Railroad Company against the Iron Mountain to recover a balance of rental due March 1, 1884, and the rentals from March 1, 1884, down to April 24, 1886, when it resumed possession of its road and for penalties accrued by reason of default of paying rent and for expenditures in putting the road in proper condition.

The cause was referred to Charles Nagel, Esq., who made a finding of facts concluding in these words:

"If, therefore, this controversy was raised between plaintiff and St. Louis, Kansas City & Northern or The Wabash, St. Louis & Pacific Railway Company, the referee would recommend a judgment in favor of plaintiff: 1. For expenditures, $136,862.37. 2. For rental, $121.235.05. 3. For penalties, $36,123.26; with interest upon these sums from the time of filing this suit."

But at the same time the referee found that under the evidence and several contracts and leases defendant, the Iron Mountain, was not liable therefor.

Three reasons are advanced by the plaintiff to reverse the finding of the referee and the judgment of the circuit court adopting that finding.

I.    *First*, that if the contract between the Wabash and Iron Mountain shall be construed to be a subletting, then the common law rule which denied the lessor a right of action against an undertenant because there was neither privity of estate nor privity of contract between them, has been abrogated by our statute, Revised Statutes, 1889, sections 6388, 6389, which provide that, "Rent may be recovered from the lessee or person owning [owing] it, or his assignee or undertenant, or the representative of either, *by the same remedies given in the preceding sections;* but no assignee or undertenant shall be liable for rent which became due before his interest began," and, "In case

any tenant shall sub-let any premises or any part thereof demised or let to him, the landlord shall *have* the right, *in any action provided for by this chapter*, to join as party defendants his lessee and all sublessees in the same action."

In the absence of modification by statute the common law gave the lessor no right of action on any of the covenants of the original lease against the subtenant or under lessee of his lessee because there was no privity of contract between the lessor and the sublessee, and because there was no privity of estate. About this there can be no controversy, nor do we understand the counsel for plaintiff contends otherwise. 2 Taylor on Landlord and Tenant [8 Ed.], sec. 448; 1 Woodfall on Landlord and Tenant, p. 265; 1 Washburn, Real Prop. [5 Ed.], p. 546, subsec. 5; Wms. Real Prop. 336; *Holford v. Hatch*, 1 Doug. (Eng.) 187; *Grundin v. Carter*, 99 Mass. 15; *McFarlan v. Watson*, 3 N. Y. (Coms.) 286.

What modification of the common law on this subject, then, has been wrought by sections 6388 and 6389, *supra?*

By section 6388 the landlord is given only "the same remedies given in the preceding sections." It is essential to know what *remedies* "the preceding sections" give.

A critical examination of the chapter of landlords and tenants discloses only two sections that relate to remedies for recovery of rent, and they are sections 6376 and 6384.

By section 6376 it is provided "every landlord shall have *a lien upon the crops grown on the demised premises* in any year, for the rent that shall accrue for such year, and such lien shall continue for eight months after such rent shall become due and payable and no longer."

By section 6384, *any person who is liable to pay rent shall be liable to attachment for such rent in the following instances: First.* When he intends to remove his property from the leased premises. *Second.* When he is removing his property from the leased premises. *Third.* When he has, within thirty days, removed his property from the leased premises. *Fourth.* When he shall in any manner *dispose of the crop, or any part thereof, grown on the leased premises, so as to endanger, hinder, or delay the collection of the rent. Fifth. When he shall attempt to dispose of the crop, or any part thereof grown on the leased premises, so as to endanger, hinder, or delay the collection of the rent. Sixth. When the rent is due and unpaid after demand thereof.*

And the proviso, at the end of section 6384, makes *any person who shall buy any crop grown upon demised premises, upon which rent is unpaid, if he has knowledge that such crop was grown on demised premises, liable in an action for the value thereof* to any party entitled thereto; or such person may be garnished in any suit for the recovery of such rent.

It is evident that the section giving the owner of land a lien on the crop grown on the premises and the other section giving the right to attach the *personal* property including the crops grown on the demised premises were *remedies* in addition to those afforded by the common law to the landlord against his tenant, and by section 6388 the right of lien and attachment was extended to the personal property and crops of the sublessee or undertenant, but the right to sue at common law and recover judgment against the undertenants on covenants and contracts to which they were not parties is not given by either of those sections or any preceding section in said chapter.

It is obvious these are new statutory remedies to be enforced in statutory proceedings.

*Hicks v. Martin*, 25 Mo. App. 359; *Hulett v. Stock-well*, 27 Mo. App. 328, and *Garroutte v. White*, 92 Mo. 237, were all cases in which resort was had either to the attachment given by the statute, or a suit to enforce the lien secured thereby to the landlord, and must be construed in relation to the facts of each, and while we think they were all correctly decided, they do not reach the question involved in this record.

Unquestionably it was the purpose of the statute to give the lien and attachment in the cases specified against the undertenant or sublessee as well as against the original lessee and to that extent the common law was repealed, but we do not think either of those sections can fairly be construed to give the landlord the right to sue the sublessee in an action at law upon the covenants of the lease to the tenant when *no lien* is sought against the crop grown on the premises and *no right of attachment exists*. It does not follow that because a lien or attachment is given against a sublessee that an action at law is given in all cases.

We think the referee and circuit court correctly ruled this point against the plaintiff.

II. But the plaintiff's main insistence is that the instrument executed by the Wabash Railroad Company to the Iron Mountain of April 10, 1883, though in form a lease, was in fact an assignment.

The difference between an assignment of a lessee's *term* and an underletting is that an assignment is a transfer of the lessee's *whole interest* in the leased premises, whilst an underlease leaves a portion of the lessee's estate still in him, though, it has been said, it be but an interest for a day or an hour, as a reversion. 2 Thos. CokeLitt. *566, n. (s).

If the whole of the unexpired leasehold estate is conveyed, then the party to whom it is conveyed becomes a privy in estate, whatever the form of the

instrument, whether an assignment or a lease.  *Sexton v. Chicago Storage Co.*, 129 Ill. 318, 16 Am. State Rep. 274; *Craig v. Summers*, 47 Minn. 189, 15 L. R. A. 236; *Dunlap v. Bullard*, 131 Mass. 161; *Stewart v. Railroad*, 102 N. Y. 601; 2 Minor's Inst. p. 718; 2 Blackstone's Com. 326, 327; *Blumenberg v. Myres*, 32 Cal. 93, 91 Am. Dec. 560.

As to the statement of the distinction between the two there is no conflict of authority, but in the application of the principle the cases are irreconcilable.

The difficulty, to some degree, seems to have grown out of the use of the word *term*.   In many cases the word has been used to designate merely the *length* of *time* for which the lease is granted, but in others, and originally, it signified not merely the *time* specified in the lease, but the estate and interest that passes by the lease; "and therefore the *term* may expire, during the continuance of the *time*; as by surrender, forfeiture, and the like."  2 Blackstone's Com. *144;  1 Lomax Dig. 174, 175; 1 Thos. Coke Litt. 630–632.

In *Stewart v. Railroad*, 102 N. Y. 601, it is stated, in the majority opinion, that, as between the landlord and the assignee, or sublessee, "if the lessee parts with his whole term or interest as lessee, *or makes a lease for a period exceeding his whole term*, it will, as to the landlord, amount to an assignment of the lease, and the essence of the instrument *as an assignment*, so far as the original lessor is concerned, *will not be destroyed by its reserving a new rent to the assignor with a power of re-entering for nonpayment, nor by its assuming, by the use of the word demise* or otherwise, the character of a sublease; and the assignee, so long as he continues to hold the estate, is liable directly to the original lessor on all covenants in the original lease which run with the land, including the covenant to pay rent;" whereas, in *Dunlap v. Bullard*, 131 Mass. 161, it is as

firmly asserted that, "to constitute an assignment of a leasehold interest, the assignee must take precisely the same estate in the whole or in a part of the leased premises which his assignor had therein. He must not only take for the whole of the unexpired *time*, but he must take the whole estate, or, in other words, the whole *term*. * * * If by the terms of the conveyance, be it in the form of a lease or an assignment, new conditions with a right of entry, or new causes of forfeiture are created, then the tenant holds by different tenure, and a new leasehold interest arises, which can not be treated as an assignment or a continuation to him of the original term." And to the same effect are *U. S. v. Hickey*, 17 Wall. 9, and *Collins v. Hasbrouck*, 56 N. Y. 157.

Washburn in his treatise on the law of Real Property (Vol. 1 [5 Ed.], pp. 542, 543), says that in England the rule seems established that unless the sublease is less *in point of time* than the original term, it is an assignment and not a subletting; but, in the United States, a different rule seems to have prevailed. After reviewing the decisions in New York he refers to the two cases of *Collins v. Hasbrouck*, 56 N. Y. 157, and *Ganson v. Tifft*, 71 N. Y. 48, and says (at p. 545): "In both of these [cases] the doctrine was maintained *unqualifiedly* that a covenant of the sublessee to deliver up the premises to the mesne lessor at the expiration of the term, and the reservation by the latter of a right of re-entry, made a lease, and not an assignment, though the demise was of the entire term."

As stated by Washburn, the more recent English cases and text-books concur in holding that, where all of the lessee's estate is transferred, the instrument will operate as an assignment notwithstanding that words of demise instead of assignment are used and notwithstanding the reservation of a rent to the mesne lessor

or original lessee and a right of entry by him for the nonpayment of rent or the nonperformance of the other covenants contained in it. 1 Platt on Leases, pp. 1, 9, 102; 1 Woodfall on L. & T. [1 Am. Ed.], 211; 1 Wood on L. & Tenant, sec. 93; Taylor on L. & T. [8 Ed.] 16; *Beardman v. Wilson*, L. R. 4 C. P. 57; *Doe v. Bateman*, 2 B. & Ald. 168; *Wollaston v. Hakewill*, 3 Scott (N. C.), 616.

This view after a careful review has been adopted by the supreme court of Illinois in *Sexton v. Chicago Storage Co.*, 129 Ill. 318, and the supreme court of New York in *Stewart v. Railroad*, 102 N. Y. 601.

It is pointed out by Judge SCHOLFIELD in *Sexton v. Chicago Storage Co.*, *supra*, that the supreme court of Massachusetts in *Dunlap v. Bullard*, *supra*, reached the conclusion that a demise of the entire term in that case was not an assignment because there was a right reserved in the lease for the mesne lessor to re-enter for breach of the covenants in the sublease, but this was held upon the ground that under the decisions of that court the right to re-enter and forfeit the lease is a contingent reversionary estate in the property and capable of devise. *Austin v. Cambridgeport*, 21 Pick. 215; *Brattle Square Church v. Grant*, 3 Gray, 142.

But these decisions of the Massachusetts court have no support in the common law. The right of entry for condition broken is not an estate in lands or even a possibility of reverter; it is a mere chose in action. 6 Am. and Eng. Ency. of Law, 903; *Schulenberg v. Harriman*, 21 Wall. 44; *Hooper v. Cummings*, 45 Me. 359; Tiedeman, Real Prop., sec. 277, note 1; 4 Kent's Com. [14 Ed.], *126, *123; 1 Washburn, Real Prop. 474; *Southard v. Railroad*, 26 N. J. L. 21.

So that it results that if the sublease so effectually passes the whole term that it must be held to be

an assignment, then privity of estate is established and the sublessee becomes bound by the covenants of the original lease irrespective of his intention.

Accepting the foregoing as the test by which the liability of defendant is to be fixed, was the contract between the Wabash and the Iron Mountain railroads an assignment of all the former's estate and interest in the lease of plaintiff's road?

In view of the importance of a proper determination of this point, at the risk of being deemed prolix, we restate the essential features of that contract.

The Iron Mountain covenants to take the Wabash company's railroad, including plaintiff's leased line, and efficiently operate the same; with due diligence to collect and receive the tolls, and freight charges which should accrue from the operation of the road and apply the said revenues: *First*, to the cost of repairing and betterments, to paying insurance and taxes on the Wabash railroad and leased lines; *second*, to paying necessary expenses of maintaining the organization of the Wabash, including its general offices in New York, and the interest on its mortgage debt and the expense of a transfer agency; *third*, to the payment of interest as the same became due upon the consolidated mortgage bonds of the Wabash and rents and other charges contracted by the Wabash and such other charges as the Wabash might authorize or direct the Iron Mountain to pay; *fourth*, to pay any *surplus* to the Wabash company or apply the same to the payment of bonds thereafter issued by the Wabash or such purposes as the board of directors of the Wabash should determine.

In addition to these duties there was a clause containing a provision that if the net earnings or revenue should not be sufficient to provide for the fixed charges

on the demised premises, the Iron Mountain might elect to advance the funds required to pay interest on bonds and other fixed charges, and have a preferred lien therefor, but if it elected not to advance such deficit and the interest remained unpaid six months the Wabash could elect to terminate the arrangement and receive back the property. It agreed furthermore to keep accurate accounts of all the business receipts, and revenues arising from the Wabash system and all the expenses of operating the same and to so keep them that the earnings of the Wabash could be readily ascertained and determined and that its books should be at all times subject to examination by the officers of the Wabash and their agents and to furnish monthly and semiannual statements of all the business, receipts, and expenditures, and to furnish free transportation at all times to the officers and agents of the Wabash to examine into the management of the road.

As plaintiff's right to recover on this branch of the case is bottomed upon the claim that this contract is a sublease of the entire term of the Wabash granted in the lease by plaintiff and therefore an assignment whereby defendant was brought in privity of estate with plaintiff, the first inquiry must be, is that contract a lease or sublease?

After a careful consideration of all its terms and stipulations we are constrained to hold that it is not. Its use of the words "demise" and "lease" can not be held to be controlling. For want of a better definition it may be styled an operating contract, under the stipulations of which the Wabash retains all the substantial and beneficial interest in its several railroads and leased lines and in which the Iron Mountain railroad, under the power of attorney therein granted, assumes to operate the Wabash system, collect the tolls and

freights, and disburse them for the sole use and benefit of the Wabash subject at all times to the supervision of the board of directors of the Wabash as to its management and the right to inspect its books and the accounts of the earnings and disbursements.

It will be observed that the Iron Mountain nowhere in said contract binds itself to pay the Wabash a certain rent unconditionally out of its own moneys and revenues. It merely undertakes that out of the earnings of the Wabash it will, so far as they will suffice, pay the fixed charges which the Wabash had already assumed, and if there is any surplus, to pay this over as directed by the board of directors of the Wabash. Under no circumstances are the earnings of the Wabash system or any part thereof to become the property of the Iron Mountain. All idea of individual liability of the Iron Mountain over and beyond the earnings of the Wabash for any of the obligations assumed is carefully and studiously excluded. There is no right on the part of the Wabash to a certain profit issuing periodically out of its properties as rent reserved.

Instead of passing to the Iron Mountain a definite determinate estate of which it should be the absolute owner, it seems to us that the true effect of the whole instrument was to leave the beneficial estate in the Wabash and to constitute the Iron Mountain its agent to manage and operate the road subject to the supervision of the Wabash and with the right of the Wabash to know at all times that the earnings and receipts were being disbursed for its use and benefit. While it was a perfectly valid contract, it is a misnomer to call it a lease or sublease. *State ex rel. v. Schweickardt*, 109 Mo. 496; *Anglade v. St. Avit*, 67 Mo. 434.

To transform this carefully guarded undertaking merely to operate the road for the Wabash and account to it for all the earnings and disburse them for its sole

use, into the unconditional and absolute liability assumed by the Wabash in the lease from plaintiff to it would certainly be subversive of the clear intention of the Wabash and the Iron Mountain, and, as already said, this ought never to be done unless the established rules of law will permit no other alternative.

We are all of the opinion that the transaction was not a sublease and hence in no sense an assignment, and that the Iron Mountain can not be held for the rentals of plaintiff's road during the time it was in the hands of the receivers of the Wabash system. Viewed in all its aspects, the right of forfeiture, and the right to compel the application of all the earnings of the road to its sole use and benefit, it was the reservation in the Wabash of the real beneficial interest in said term and falls far short of a transfer of its whole interest and estate therein, and it follows that as it did not amount to an assignment, no privity in estate or contract was created between plaintiff and the Iron Mountain and consequently no right of action on the covenants of the original lease against it, and no error was committed by the circuit court in so holding.

III. Still a third ground of recovery is urged by counsel for plaintiff, to wit, that the covenant made by defendant to keep the road in repair, was made for the benefit of plaintiff and plaintiff has a right to sue thereon for its breach.

The covenant is as follows: "The party of the second part moreover shall and will at all times during the hereby demised term keep the buildings upon the lands hereby demised insured in the usual manner against loss by fire, paying the premium therefore as aforesaid; and will keep the said demised railroad, equipment, and property in good order and repair and will, at the expiration of the hereby demised term, or *other sooner determination*, of this lease and contract

yield and deliver up the hereby demised railroad and appurtenances *in the same good order and repair as the same are now in or may be put in* during the hereby demised term, casualties, acts of God, and the elements and reasonable wear and tear excepted."

The referee found that the defendant not only kept the road in as good repair as it was when it took it but greatly improved it. He also found that the Wabash utterly failed to perform its covenant in the original lease to put plaintiff's road in such order and repair at its own cost as to enable said road to be safely and successfully operated *"at the earliest practicable day;"* that nine years had elapsed before the contract with the Iron Mountain, and this covenant had been broken long before the Iron Mountain went into possession.

Upon the facts found we think it is clear that the defendant was not liable for the breaches in the original lease which had occurred long before it took possession. *Patten v. Deshon*, 1 Gray (Mass.), 329; *Coward v. Gregory*, L. R. 2 C. P. 153; *Tillotson v. Boyd*, 4 Sandford (N. Y.), 521; *St. Saviour's Churchwardens v. Smith*, 3 Burr. 1271.

What is the measure, then, of its obligation on its own undertaking? A covenant "to keep" leased premises in repair imposes upon the tenant the obligation to keep the premises in as good repair as when the agreement is made. *Middlekauff v. Smith*, 1 Md. 329; *Stultz v. Locke*, 47 Md. 562; *Gutteridge v. Munyard*, 7 C. & P. 129; 1 Wood's Landlord & Tenant, sec. 367.

Covenants "to keep in repair" and "to keep in as good repair as they now are," are held to amount to the same thing in law. Inasmuch as the railroad was confessedly out of repair when the defendant agreed to take it and as it only bound itself "to keep it in repair and return it in as good condition as it now is," and

the referee found that it greatly improved the road, we think the plaintiff is precluded by this finding. There is and ought to be a marked distinction between a covenant to keep premises, which are in good repair, in repair, and a similar covenant to keep an old house or dilapidated premises in good repair. The judgment is affirmed. SHERWOOD and BURGESS, JJ., concur.

### ON MOTION FOR REHEARING.

GANTT, P. J.—We have been moved to grant a rehearing herein.

We still adhere to the view originally expressed that the litigated instrument was *not a lease* but simply (for want of a better expression) "an operating contract." We attach no importance to the fact, for reasons already given, that the parties to that contract denominated it a lease. Nor is the defendant concluded by the admission in its answer that it was a lease since the admission was accompanied by profert of the instrument on which its admission was based. Such an admission can not "in the smallest degree alter or affect the tenor of such instrument." This could no more be done than could the jurisdiction of a court be defeated by a failure to deny the charge that no jurisdiction existed. *Edmonson v. Phillips*, 73 Mo. 57. This principle is also illustrated by that class of cases which hold that where the truth plainly appears on the face of a deed there is no estoppel. Bigelow on Estoppel, [5 Ed.], 361.

And while on the subject of what the instrument really is it may not be altogether inappropriate to recall a saying of Lord BROUGHAM that he remembered a case wherein Lord ELDON referred it in succession to three courts to decide what a particular document was. The court of Kings Bench decided it was a lease in fee; the

common pleas, that it was a lease in tail; the Exchequer, that it was a lease for years. Whereupon Lord ELDON, when it came back to him, decided for himself that it was *no lease at all.* Green Bag, April, 1896, p. 181.

Omitting, for the present, further discussion of the character of the instrument, we come to the pith of the motion for rehearing, namely, that this court ought not to hold said instrument a valid operating contract because such an agreement was *ultra vires* as to the Wabash railroad.

What corporations may lawfully do is summed up in a few words by Judge THOMPSON in his recent commentaries on the Law of Corporations, volume 4, section 5645, where he says: "In respect of the power of corporations to make contracts, two propositions may be stated:—1. That they have, by mere implication of law and without any affirmative expression to that effect in their charters or governing statutes, and of course in the absence of express prohibitions, the same power to make and take contracts, within the scope of the purposes of their creation, which natural persons have; 2. That this power, on the other hand, is restricted to the purposes for which the corporation has been created, and can not be lawfully exercised by it for other purposes."

This statement of the law accords with the general current of authority on this subject.

In *Barry v. Merchants Exchange Co.*, 1 Sandf. Chcy. 280 (*loc. cit.* 288, 289), a case decided over a half century ago, and elaborately considered, it was said: "Every corporation, as such, has the capacity to take and grant property, and to contract obligations in the same manner as an individual. * * * And every such corporation has power to make all contracts which are necessary and usual in the course of the business it

transacts, as means to enable it to effect such object, unless expressly prohibited by law, or the provision of its charter.''

This court has frequently announced similar views. *Baile v. Ins. Co.*, 73 Mo. 371; *Liebke v. Knapp*, 79 Mo. 22; *Detweiler v. Breckenkamp*, 83 Mo. 45.

As instances of the application of this doctrine, it has been held that a railroad corporation may purchase a tract of land containing *gravel* in furtherance of a contract between it and a third person whereby the gravel is to be excavated and hauled over its road to a distant place for which it is to receive compensation, and the court decreed specific performance of the contract. *Railroad v. Evans*, 6 Gray, 25. And, though frequently doubted whether it could be legitimately done, it is now abundantly settled that an *implied* power exists in a railroad company to contract with another railroad company or other corporation to carry goods or passengers beyond the terminus of its own lines even though the transit be accomplished in whole or in part by water. *Railroad v. McCarthy*, 96 U. S. 258; *Perkins v. Railroad*, 47 Me. 573.

Reciprocal contracts of this nature have not infrequently been recognized by this court. *Wiggins Ferry Co. v. Railroad*, 73 Mo. 389; *Ibid v. Ibid*, 128 Mo. 245.

In other cases this court has held a railroad company liable for loss of goods contracted to be transported beyond its own terminus. *McCann v. Eddy*, 133 Mo. 59.

In *Railroad v. Ayres*, 140 Ill. 644, in a sentence which embodies the whole decision, it was said: ''Without attempting to determine whether, as a general proposition, corporations may contract joint obligations, there can be no doubt, we think, of the power of two or more railway companies, whose railways form a continuous line, to enter into a joint arrangement for

operating their railways as one 'line,' and to become jointly liable for money borrowed to be used in furtherance of the business of such 'line.'" See, also, *Railroad v. Union Steamboat Co.*, 107 U. S. 98; 5 Thomp. Corp., secs. 5872, 5873.

So, too, where a railroad company was engaged largely in the shipment of cotton it has been ruled to be one of its implied powers to enter into a contract with a steamship company for a specified amount of space on its ships *for the shipment of cotton across the ocean* to be delivered at specified times at the point of shipment. *Railroad v. Shippers' Compress Co.*, 83 Va. 272. There are many other cases to the same effect. 5 Thomp. Corp., sections 5872, *et seq.*

These illustrations serve to show that the vigorous rule announced by counsel, "that a railroad company possesses only the powers specified in its charter and such others as are *absolutely* necessary to the exercise of those powers," states the doctrine too broadly and can not be reconciled with current and prevalent modern authorities. On the contrary it would seem from these authorities that in regard to implied powers of corporations such powers, in the absence of express prohibitions, may well be held to result from those specifically granted, provided always they be within the scope and purposes of the creation of the corporation and fall within the reasonable contemplation of the charter. Within these bounds a corporation is no more restricted in the exercise of its implied contractual power than a natural person.

Plaintiff urgently insists that the instrument is a lease because it is the only instrument authorized to be made by one railroad to another by the provisions of section 2568, Revised Statutes, 1889, and therefore it *must* be a lease.

If this section were the only one to be looked to

there might be considerable force conceded to this contention on the principle of *expressio unius*, but section 2588 of the same article and chapter provides that, "all railroad corporations may contract with each other, or with other corporations, in any manner not inconsistent with the scope, object, and purpose of their creation and management."

A brief history of this section in its former and in its present condition may be worthy of preservation. In its original legislation on this subject the general assembly only permitted railroad companies to contract with *each other* for the transportation of persons and property over their respective roads. Laws 1860 [Extra Sess.], p. 27. In 1864 a doubt having been intimated in the *Mo. Coal & Oil Co. v. Railroad*, 35 Mo. 84, whether a railroad company could contract with a *steamboat company* whereby the latter could be bound to deliver freight for the former, the legislature soon after said opinion amended the statutes, so as to make it read as it does at present. General Statutes, 1865, page 341, section 32; Revised Statutes, 1879, section 801.

This section in its present shape may well be regarded as conferring the requisite authority to make the "operating contract" under discussion. In fact that section is simply declaratory of the principle announced in the decisions already cited and quoted. Indeed, section 2588 would seem to expand the result even of the advanced cases because it legitimates any contract between two railway companies "not inconsistent," etc., so that under this section the given transaction need not be *"absolutely* necessary" nor indeed *"necessary"*. It is only obnoxious when it is found to be *inconsistent* with the purposes of the creation and management of the corporations.

The previous history of section 2588 both legisla-

tive and judicial would seem to indicate an intention on the part of the state to further and foster transportation of freight and passengers on through lines, and certainly such *inter sese* arrangements between railway and other transfer ·corporations must greatly tend to the public convenience and prevent delays otherwise incident to travel and transshipment. Under this section the contract between two railway companies may be a lease, or an operating contract, or a temporary permission or parol license, to use and occupy the line of one company to expedite the trains· of another \because of some disaster or accident, or otherwise, provided always that the matter contracted about and the end sought is "not inconsistent" with the purposes for which the railroad is chartered.

In making this contract the Wabash railroad, embarrassed by debt, was providing for the performance by another railroad of those duties for which it was created, duties not only not inconsistent, but duties absolutely imposed upon it. By no word or stipulation did it relieve itself of its obligations to the public, and its contract was in our opinion *intra vires* under the express terms of the statute.

In conclusion we have no doubt that the result reached by us in the original opinion is correct and we are fortified in this view by the additional reasons herein given. Accordingly a rehearing is denied.